**REVERSE and REMAND; and Opinion Filed October 29, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01528-CR

### THE STATE OF TEXAS, Appellant
### V.
### CASEY BENSON, Appellee

### On Appeal from the 204th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F13-10017

## OPINION

Before Justices O'Neill, Lang-Miers, and Brown
Opinion by Justice Lang-Miers

Appellee Casey Benson is charged with engaging in organized criminal activity involving prostitution. In this interlocutory appeal the State of Texas challenges the trial court's order granting Benson's pretrial motion to suppress evidence. We reverse and remand.

### BACKGROUND

Benson was one of eight people arrested after the police obtained and executed warrants to search five apartments. Seven of the defendants, including Benson, filed separate pretrial motions to suppress evidence seized at one or more of the apartments. The trial court held a consolidated hearing and granted all of the defendants' motions.[1]

---

[1] The State appealed the trial court's ruling in each case and we decide this appeal at the same time we decide the other cases: *State v. Wongsamrit*, case number 05-13-01525-CR; *State v. Komviriyawut*, case number 05-13-01526-CR; *State v. Chevagunpirom*, case number 05-13-01527-CR; *State v. Duarte*, case number 05-13-01529-CR; *State v. Duarte*, case number 05-13-01530-CR; and *State v. Ronmai*, case number 05-13-01531-CR.

**The Warrants**

The warrants at issue in the hearing on the defendants' motions to suppress authorized the search of five apartments for evidence of human trafficking, money laundering, and various prostitution-related offenses. Four of the apartments are in Addison, Texas: 15801 Artist Way #4119, and 3820 Vitruvian Way #234, #521, and #552. The fifth apartment is in Frisco, Texas: 3198 Parkwood Boulevard #13053. The warrants were issued on February 12, 2013, and executed on February 13, 2013.[2]

**The Probable-Cause Affidavits**

The affidavits filed in support of the warrants were signed on February 12, 2013, by Sergeant K. McFarland, who at the time had 14 years of experience as a police officer. Except for the descriptions of the apartments the police were seeking to search, the affidavits are virtually identical. In his affidavits McFarland stated, "I have probable cause to believe Waralee Duarte, Josue Duarte, and Casey Jay Benson are operating a prostitution and human trafficking ring." To support that statement McFarland attested to the following facts.

*The Anonymous Tip*

On January 22, 2012,[3] members of the Farmers Branch police department gave McFarland and another Addison police officer a package they received from an unknown person. The package was addressed to the Farmers Branch police department and the return address read "Need Help." Inside the package was a flash drive that the sender had named "NEED HELP."

---

[2] The search warrants for the Addison apartments were issued by the same magistrate and the search warrant for the Frisco apartment was issued by a different magistrate.

[3] Towards the outset of the hearing on the defendants' motions to suppress, the State told the trial court that "there is a typo [in the affidavit] of 2012 instead of 2013" (according to McFarland and the subsequent police report), making it appear that the police waited over twelve months between the time they received the anonymous tip and the time they began their investigation. The State argued at the hearing that it was reasonable for the magistrates to deduce that the year stated in connection with the receipt of the anonymous tip was a typo. On appeal the State notes that because there was no other evidence presented at the hearing, "the facts had to be interpreted as they were stated literally in the affidavits."

The flash drive contained an electronic file folder labeled "secret." In that folder was a text file stating as follows:

> I am one of the girl to need help.i come united because have agency provide her name **Waralee Duarte. 3820 vitruvian way.apt 552 ,addison TX 75001**and Casey jay benson 3198 Parkwood blvd. apt 13053 Frisco TX 75034** Them charge me $60,000 and force me to have sex a lot of guy and force me to do Ass and swallow sperm.i can't said anything because them keep my passport and all of passport in safe box

The message concluded with "please looking for," along with a list of three websites and five telephone numbers. The flash drive also contained "several photos of young Asian females in varying states of undress," approximately 17 "prostitution and erotic message ads," ads from multiple "escort websites," a screen shot of a cell phone map leading to 3820 Vitruvian Way, and a photocopy of Waralee Duarte's driver's license.

McFarland searched the websites listed on the flash drive and located ads "contain[ing] identical pictures to those located on the flash drive." He also determined that the phone numbers listed on the flash drive matched the phone numbers on the ads.

### The Vitruvian Way Apartments

On February 5, 2013, McFarland and Special Agent Gregg Buchholz, a federal Homeland Security agent assigned to investigate human smuggling and trafficking, went to the Savoye apartment complex located at 3820 Vitruvian Way in Addison and spoke to the manager. The manager asked them if they "were inquiring about apartment #552 due to a prostitution ring." Apartment #552 was leased to Waralee Duarte. According to the manager, in June 2012,

> an unidentified Chinese food delivery driver, a male, stated he was concerned for the welfare of the females in the apartment. The driver stated there was a prostitution ring in the apartment and the Dallas Police Department was aware of the ring. The driver just wanted to notify management.

The manager could not recall the name of the driver or where he worked. She explained that she did not call police because the driver said "DPD was aware of the prostitution."

The manager also told McFarland and Buchholz that apartment #521 was leased to Benson, and that Benson and Waralee Duarte rented the apartment complex's lounge in June 2012 "for a 'marriage ceremony' between the two." The resident services manager at the complex witnessed the ceremony and said that it was attended by "numerous young Asian females" who "seemed morose and almost nervous." The manager told McFarland and Buchholz that apartment #234 was leased by Waralee Duarte's "son," Josue Duarte. But Buchholz later determined that Waralee and Josue Duarte are married. With respect to the apparent connection among the tenants in apartments #234, #521, and #552, McFarland attested,

> Management at Savoye stated they have become increasing[ly] suspicious of apartments #234 (registered to Josue Duarte), #521 (registered to Casey Benson), and #552 (registered to Waralee Duarte). They stated the three residents appear in each apartment regularly. They find it odd that a married couple maintain separate apartments. They have noticed young Asian females in all the apartments. When apartment maintenance performs services at any of the three apartments, Josue Duarte follows maintenance personnel through the apartment, watching their every move. Maintenance stated they are not allowed in one bedroom in apartment #521. The door to the bedroom is always closed. [A maintenance worker] stated he has witnessed numerous males going to and leaving apartment #552. [He] stated on prior service calls he has seen a "rice screen" blocking view of the kitchen area. [He] stated he has seen an identical screen in #234. [He] stated he has seen packages addressed for apartment #552 in apartment # 234.

According to the manager, Waralee Duarte had "an apartment move out walk through" scheduled for the next day, February 6, because she was scheduled to move out at the end of the month. McFarland and Buchholz returned to the apartment complex on February 6 to inquire about the walkthrough. The manager said that she and a maintenance worker who "speaks and understands some of the Thai language" arrived at apartment #552 for the scheduled walkthrough. When they knocked they heard "three different Asian female voices" and one of them said "'it's the boss' in Thai." An Asian female "wearing a shear 'tank dress' with no undergarments" answered the door. She denied them access and "stated they were cooking," but

–4–

there was "no cooking odor." They could not see inside the apartment "due to a room separating screen just past the entryway."

The manager told McFarland that apartments #521 and #234 requested pest control scheduled for the following day, February 7. McFarland and three investigators went to the leasing office at Savoye on February 7 to talk to the pest control worker. The worker, who had "no prior knowledge of any suspected activity," told McFarland that when he entered apartment #521 "[t]here was a young Asian female present wearing a robe." No one was present in apartment #234.

The manager explained that the entryways to the Savoye apartments are locked. Residents can open them either by using their electronic key fob or remotely by telephone. At McFarland's request the manager provided a log of telephone entries provided by apartments #552 and #521. The log showed 11 telephone entry accesses by Waralee Duarte to "Elev 4 Glass Door" (the glass door leading to the elevator between apartments #552 and #521) during the time period of November 1, 2012, until February 6, 2013.[4] It also showed that Benson provided access to the building by telephone almost 400 times during that same time period, which the manager described as "a very large volume for phone access."

At 10:30 a.m. on February 7, while McFarland was at the leasing office to meet with the pest control worker, a maintenance worker entered and told McFarland that "he just saw a suspected 'John' standing outside elevator entry 4, on a cell phone." The maintenance worker described the man. He watched the man walk from entry 4 to the parking garage. The man "appeared lost while speaking on the phone and hol[d]ing a white piece of paper that he continually referenced." The man "then walked back to elevator entry 4 and was granted remote

---

[4] The affidavit states the time period as being "from 11/01/12 until 2/06/12." The parties agreed, and the trial court found, that the year next to the February date is a typo and that the correct year is 2013.

–5–

access." The maintenance worker followed the man to the fifth floor and watched him "walk down the hall to #552." One of the investigators went to the parking lot and saw a man matching the description provided by the maintenance worker enter the garage and begin looking for his car at 11:45 a.m. The maintenance worker was also in the garage and identified the man as the man he saw earlier. The investigator recorded the man's license plate number and determined that it was registered to a man residing in Joshua, Texas. According to McFarland,

> The male was in the apartment for an hour and fifteen minutes. This is a consistent time frame for prostitution clients. Appointments are generally booked at 30 minute to one hour time frames. The actions and time spent by the male were consistent with the suspected prostitution activity at apartment #552.

Access logs showed that Benson provided telephone access to elevator entry 4 on February 7 three times between 10:32 a.m. and 10:53 a.m.

### The Parkwood Boulevard Apartment

McFarland and Buchholz also went to the apartment complex located at 3198 Parkwood Boulevard in Frisco and spoke to a manager about apartment #13053, the other apartment identified on the flash drive. The manager said "there were rumors about a prostitution ring in this apartment involving Asian females." The manager confirmed that Benson was listed as the resident. Benson's lease application stated that he is a professional photographer. He paid his rent by money order and his proof of income was a "Paypal receipt." The manager also said that Josue and Waralee Duarte came to view the apartments "as potential renters" in April 2010 and in September 2012 and said "[t]hey were referred by apartment '13053,'" which was leased to Benson on both dates.

McFarland and Buchholz also spoke to two maintenance workers who both said that when they have entered the apartment to complete work orders they have seen "several young Asian females" in the apartment and have "rarely seen" Benson. They described the apartment as sparsely furnished. The living room was set up "like a photography studio with backdrops

and lighting." One bedroom had a bed and was "full of computer equipment." The other bedroom had "2 twin size beds, with no decorations or television in the room." The maintenance workers looked at the ads from the flash drive and said the women identified in the ads as "Asian Michelle" and "Asian Katie" are "two of the females they have possibly seen in the apartment."

### *The Artist Way Apartment*

McFarland also met with the manager of the apartment listed on Benson's driver's license, 15801 Artist Way #4119 in Addison. The manager said Benson "does maintain a residence at this address" but she "never sees Benson." One of the leasing agents said that an Asian female who goes by the name "Rose" lives with Benson and is listed on the lease using a different name and her passport number for identification. When Rose comes to the office to pay rent or request service on the apartment she is accompanied by a white man in his sixties named Roy who interprets for her. Rose told management that she and Benson "are getting married soon." Rose speaks "very little English," and management suspects she is "a mail order bride."

### The Hearing on the Defendants' Motions to Suppress

During the consolidated hearing on the motions to suppress, counsel for the defendants primarily argued that the anonymous tip on the flash drive was stale by the time the warrants were issued, and the other facts stated in the affidavit were innocuous and as consistent with innocent activity as with criminal activity. In response, the State argued that under the totality of the circumstances the magistrates could have reasonably determined that there was a substantial basis for issuing the warrants.

**The Trial Court's Ruling**

The trial court issued written orders granting the motions to suppress, including Benson's motion, which included its findings of fact and conclusions of law.[5] With respect to Benson in particular, the trial court found that he had standing to challenge the searches of three apartments: 3820 Vitruvian Way #521, the Artist Way apartment, and Parkwood Boulevard apartment. With respect to the flash drive, the trial court stated,

- The information from the flash drive was over a year old at the time the warrant was signed and therefore was stale.

- [T]he information on the flash drive was undated and was from an unknown source.

- None of the information on the flash drive with regard to a person being forced to have sex or that a person's passport was taken from them and being kept in a safe was corroborated by any of the other information provided in the affidavit.

With respect to the Vitruvian Way apartments, the trial court stated,

- [T]he information from the unidentified Chinese food delivery driver obtained in June of 2012 concerning his belief that there was a prostitution ring operating out of apartment 552 was both stale and uncorroborated.

- [T]he information received from [the maintenance worker who stated he saw numerous males entering and exiting apartment #552] . . . fails to provide any facts as to when he saw the persons coming and going, how many he saw, how long they stayed at the apartment, or any other information that might support a finding of probable cause or might corroborate any of the other information in the affidavit[.]

- Entry access logs for Vitruvian Way showed that Casey Benson activated telephone entry access numerous times between November 1, 2012 and February 2, 2013. . . . [T]here is no factual support stated in the affidavit

---

[5] After this Court received the clerk's record we issued an order directing the trial court to prepare a written order memorializing its ruling on Benson's motion to suppress and file a supplemental record containing the order. In response the trial court submitted a supplemental clerk's record containing an order granting Benson's motion that included the findings of fact and conclusions of law quoted in this opinion. The order was titled "TRIAL COURT'S FINDINGS OF FACT ON DEFENDANT'S MOTION TO SUPPRESS" and concluded by stating, "**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress is GRANTED[.]" Although the record does not reflect that the State requested findings and conclusions, and we did not abate this appeal so that the trial court could issue them, it appears that the trial court interpreted our request for a written order memorializing its ruling as a request by the State under *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006), which requires the trial court to respond to a losing party's request by making "findings of fact and conclusions of law [in connection with its ruling on a motion to suppress] adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts." Although the record does not reflect that the State requested them, the State cites to and quotes the findings and conclusions in its appellant's brief.

for the assumption that access was for customers of prostitution. There is also no factual support for the assumption that the persons were going to apartment #552.

- Although [a maintenance worker told McFarland] that he saw a suspected "John" standing by the elevator, there are no facts provided as to why this person was a suspected "John" other than he was a male by the elevator leading to the fifth floor. [The maintenance worker] saw the person headed toward apartment 552 but did not see the person enter or leave any particular apartment.

- [The statement that the suspected] "John" was in the apartment for an hour and fifteen minutes [was] apparently based on when the officers saw the man in the parking garage and not on when they saw him enter or leave any apartment. The statement in the affidavit that this is consistent with suspected prostitution activity at apartment 552 is not supported by any facts provided in the affidavit.

- [The fact] that "management" has noticed young Asian females in apartments 234, 521, and 552 does not provide any support for the suspicion that prostitution, human trafficking, or money laundering was being conducted in apartment 234 or apartment 552.

With respect to the Parkwood Boulevard apartment the trial court stated,

- Information contained in the affidavit about rumors of prostitution at the apartment on Parkwood Drive [sic] fails to provide any corroboration of the information on the flash drive and not only fails to provide any facts that would support the search of the Parkwood Drive [sic] apartment but fails to provide any information to justify the search of the apartments on Artist Way and Vitruvian Way.

- The description of the Parkwood Blvd. apartment as being sparsely furnished and setup like a photography studio is consistent with Casey Benson's listed occupation as a self-employed photographer and fails to provide any information that would support a finding that trafficking of persons, compelling prostitution, aggravated promotion of prostitution, prostitution, or money laundering was being conducted in the apartment.

And in conclusion, the trial court stated,

- The Court finds that the affidavit contains numerous suspicions, and conclusions based on those suspicions, but fails to contain facts to support those conclusions.

- The activities listed in the affidavit are as consistent with innocent behavior as with criminal activity.

- When taken as a whole and read in a common sense manner, the Court finds that the affidavit fails to provide facts that would support a finding of probable cause that trafficking of persons, compelling prostitution, aggravated promotion of prostitution, prostitution, or money laundering was being conducted in apartment 521 on Vitruvian Way, apartment 13053 on Parkwood Blvd., or apartment 4119 on Artist Way.

- [T]he affidavit fails to provide any facts that any of the items listed in the warrant to be seized, including identification records, pay stubs, pay sheets, photographs, videos, cameras, thumb drives, computers, safes, etc. would be found in the Vitruvian Way or Artist Way apartments. Common sense would dictate that photography equipment and computer equipment would be found at the Parkwood Blvd. apartment where Casey Benson operated a photography business however there are no facts in the affidavit to suggest the other items would be found in the apartment. Nothing in the affidavit in support of the search warrant for the Artist Way apartment, other than the mere fact that it was one of Mr. Benson's residences, indicates that any criminal activity was taking place at the Artist Way apartment or that any evidence or contraband would be found there.

## ISSUE ON APPEAL

In one issue, the State argues that the trial court erred when it granted Benson's motion to suppress. Benson did not file an appellee's brief.

## APPLICABLE LAW AND STANDARD OF REVIEW

The Fourth Amendment establishes a constitutional preference that a search be conducted pursuant to a warrant. *Jones v. State*, 364 S.W.3d 854, 856–57 (Tex. Crim. App. 2012) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)); *see* U.S. CONST. amend. IV. Under Texas law, no search warrant may issue without a sworn affidavit that sets forth facts sufficient to establish probable cause. *See* TEX. CODE CRIM. PROC. ANN. art. 1.06 (West 2005), art. 18.01(b), (c) (West Supp. 2013); *see* TEX. CONST. art. I, § 9. Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the specified location at the time the warrant is issued. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012). Probable cause is a "flexible and non-demanding standard." *State v.*

–10–

*McLain,* 337 S.W.3d 268, 272 (Tex. Crim. App. 2011) (citing *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007)).

Because of the constitutional preference for searches to be conducted pursuant to a warrant, we apply a highly deferential standard of review to a magistrate's probable-cause determination.[6] *Bonds v. State,* 403 S.W.3d 867, 873 (Tex. Crim. App. 2013); *McLain,* 337 S.W.3d at 271 ("[T]he United States Supreme Court has provided incentives for law-enforcement officials to obtain warrants instead of conducting warrantless searches. One incentive is a less-strict standard for reviewing the propriety of a search conducted pursuant to a warrant."). Under this highly deferential standard, we interpret the supporting affidavit in a commonsensical and realistic manner, and we defer to all reasonable inferences that the magistrate could have made. *McLain*, 337 S.W.3d at 271; *Rodriguez*, 232 S.W.3d at 61; *see Bonds*, 403 S.W.3d at 873. We consider the totality of the circumstances and determine whether there are sufficient facts stated within the four corners of the affidavit, coupled with inferences from those facts, to establish a fair probability that evidence of a particular crime would be found at a given location. *Rodriguez*, 232 S.W.3d at 62; *see also Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable-cause determination. *Bonds*, 403 S.W.3d at 873; *McLain*, 337 S.W.3d at 271; *see also Gates*, 462 U.S. at 238–39. Although the reviewing court is not a "rubber stamp," "the magistrate's decision should carry the day in

---

[6] The standard for reviewing a trial court's ruling on a motion to suppress that is based on a magistrate's probable-cause determination is different from the standard for reviewing a trial court's ruling on other motions to suppress:

> This Court normally reviews a trial court's ruling on a motion to suppress by using a bifurcated standard of review, where we give almost total deference to the historical facts found by the trial court and review de novo the trial court's application of the law. However, when the trial court is determining probable cause to support the issuance of a search warrant, there are no credibility determinations, rather the trial court is constrained to the four corners of the affidavit. Accordingly, when we review the magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search.

*McLain,* 337 S.W.3d at 271 (internal citations omitted).

doubtful or marginal cases, even if the reviewing court might reach a different result upon de novo review." *Jones*, 364 S.W.3d at 856–57 (quoting *Flores*, 319 S.W.3d at 702).

ANALYSIS

The State argues that the trial court erred when it granted Benson's motion to suppress the evidence seized in the three apartments as to which the trial court found that Benson had standing. The State argues that when viewed as a whole, the facts learned during the investigation gave the magistrates a substantial basis for concluding that the information on the flash drive was not stale and that there was a fair probability that evidence of an ongoing prostitution enterprise would be found at the three apartments. We agree with the State.

The trial court concluded that the information on the flash drive was stale and could not support the magistrates' probable-cause determination because it was "over a year old at the time the warrant was signed." But the central question for the magistrates was whether "probable cause existed at the time the warrant issued to believe that the items were still located at the place to be searched." *Gonzales v. State*, 761 S.W.2d 809, 813 (Tex. App.—Austin 1988, pet. ref'd) (internal quotation and brackets omitted). As the court of criminal appeals recently explained, "[t]he likelihood that the evidence sought is still available and in the same place is a function, not just of the watch or the calendar, but of the particular variables in the case." *Crider v. State*, 352 S.W.3d 704, 707–08 (Tex. Crim. App. 2011). In addition to the passage of time between the events set out in the affidavit and the time the search warrant was issued, reviewing courts should also consider:

(1) the type of crime alleged—[a single, nonrecurring crime] versus [a] long-term criminal enterprise or conspiracy;

(2) the suspect—nomadic traveler, entrenched resident, or established ongoing businessman;

(3)     the item[s] to be seized—perishable and easily transferred [versus] enduring utility to its holder (a bank vault filled with deeds, a meth lab, or a graveyard corpse); and

(4)     the place to be searched—a mere criminal forum of convenience [versus a] secure operational base.

*Id.* at 708 (internal quotations and citations omitted). Taking into account all of the relevant factors, the passage of time becomes less significant when the facts alleged indicate activity of a protracted and continuous nature occurring at a secure operational base. *See Jones*, 364 S.W.3d at 861.

According to McFarland's affidavits, over twelve months elapsed between the receipt of the flash drive and time the warrants were issued. But based on the other relevant factors in this case it was reasonable for the magistrates to believe that the evidence sought was still located in the apartments. First, the types of crimes alleged, including human trafficking and compelling prostitution, were of a protracted and continuous nature. Second, the individuals identified on the flash drive, Benson and Waralee Duarte, were not nomadic—they were still leasing the apartments identified in the flash drive and on Benson's driver's license at the time the warrants were issued. Third, the types of evidence sought, such as computers, bank records, and passports, were not perishable and would have enduring utility to their holders. And finally, the apartments appeared to be a secure operational base for an ongoing prostitution ring. In short, this is the type of case in which the magistrates could have reasonably determined that the information on the flash drive was not stale. *See, e.g.*, *Jones*, 364 S.W.3d at 861 (noting federal courts have held that in appropriate circumstances "years could pass without information becoming stale").

The trial court also noted several facts that were omitted from McFarland's affidavits. For example, with respect to the various men the maintenance worker saw coming and going from apartment #552, the trial court noted that McFarland did not state when, exactly, the

–13–

maintenance worker saw them, how many he saw, or how long those men stayed at the apartment. And with respect to the suspected prostitution client seen by the maintenance worker and later by the police, the trial court noted that McFarland did not state that anyone saw the man actually enter or leave any particular apartment, and does not state "why this person was a suspected 'John' other than he was a male by the elevator leading to the fifth floor." But for reviewing courts, including trial courts, the issue "is not whether there are other facts that could have, or even should have, been included in the affidavit." *Rodriguez*, 232 S.W.3d at 62. Instead, "we focus on the combined logical force of the facts that *are* in the affidavit, not those that are omitted from the affidavit." *Id.*

The trial court also determined that certain facts stated in McFarland's affidavits "are as consistent with innocent behavior as with criminal activity." For example, according to the trial court, the fact that young Asian females were present in the apartments "does not provide any support for the suspicion that prostitution, human trafficking, or money laundering was being conducted in apartment 234 or apartment 552." And the fact that the Parkwood Boulevard apartment was sparsely furnished and set up like a photography studio was consistent with Benson's stated occupation "as a self-employed photographer." But reviewing courts are prohibited from isolating and analyzing particular facts stated in a probable-cause affidavit because this approach "conflicts with the established requirement that courts review warrant affidavits as a whole." *McClain*, 337 S.W.3d at 273; *see also Williams v. State*, No. 11-12-00103-CR, 2014 WL 3865786, at *6 (Tex. App.—Eastland July 31, 2014, no pet.) (mem. op., not designated for publication) ("parsing each paragraph and attacking them individually . . . is inconsistent with the prohibition against reading the affidavit in a hyper-technical manner"); *Henson v. State*, No. 03-11-00552-CR, 2013 WL 1748792, at *6 (Tex. App.—Austin Apr. 18,

–14–

2013, no pet.) (mem. op.) ("Under the totality-of-the-circumstances standard of analysis, the information contained in the affidavit must not be viewed in isolation[.]").

The affidavits in this case required some inferences by the magistrates. But considering all of the facts presented in the affidavits, we conclude that the inferences were reasonable. For example, it was reasonable for the magistrates to infer that the police received a reliable report from a woman who said that Benson and Waralee Duarte were forcing her and other women to have sex with a lot of men and were holding the women's passports to prevent them from leaving. The woman who sent the flash drive included specific information about who was running the prostitution ring and where they were operating. She also included pictures of Asian women that the police confirmed were being used as ads on websites commonly used to gain and screen prostitution clients.

It was also reasonable for the magistrates to infer that the apartments at issue were not being used as residences and were instead being used as operational bases for an ongoing criminal enterprise. When the police spoke to management at the Vitruvian Way apartments, they learned that Benson and Waralee Duarte each leased separate apartments despite being married, and that their wedding ceremony was attended by young Asian women who looked nervous. They also learned that Benson granted building access by telephone hundreds of times in the span of a few months. While the police were there investigating, a man from out of town was granted access to the building around the same time that Benson provided someone with building access by telephone. The man appeared to spend about an hour in apartment #552, which an experienced police officer attested was consistent with the behavior of a prostitution client. With respect to the other apartments, Benson's Parkwood Boulevard apartment was set up like a photography studio and the maintenance workers at the complex saw several Asian females inside who did not speak English, including, possibly, two of the Asian women from the

–15–

escort ads. The police also learned that an Asian female who did not speak English and was always accompanied by an older male interpreter lived with Benson in his Artist Way apartment and said she and Benson were getting married despite the fact that Benson appeared to have recently married Waralee Duarte.

Under the totality-of-the-circumstances test and giving due regard to all reasonable inferences that can be drawn from the stated facts, the magistrates had a substantial basis for concluding that probable cause existed to search the apartments at issue in this case for evidence of the alleged offenses, including human trafficking and prostitution. As a result, we conclude that the trial court erred when it granted Benson's motion to suppress the evidence seized at those apartments. We sustain the State's sole issue on appeal.

## CONCLUSION

We reverse the trial court's order granting Benson's motion to suppress and remand this case for further proceedings.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131528F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-13-01528-CR     V.

CASEY BENSON, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F13-10017.
Opinion delivered by Justice Lang-Miers.
Justices O'Neill and Brown participating.

Based on the Court's opinion of this date, the trial court's order granting appellee Casey Benson's motion to suppress is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

Judgment entered this 29th day of October, 2014.